BIRDSALL et al. v. DELAWARE & H. CO.

DELAWARE & H. CO. v. BIRDSALL et al.

(Circuit Court of Appeals, Third Circuit. Jan. 10, 1917. Rehearing Denied April 10, 1917.)

Nos. 2137, 2141.

MINES AND MINERALS ☞79(3)—MINING LEASES—CONSTRUCTION.

Plaintiffs entered into an agreement with defendant, whereby it agreed to mine and prepare for market all mineral coal of merchantable quality that could be safely and economically mined and taken from the demised premises. The demised premises at that time had only been partially opened, coal having been taken out of certain seams or veins known as "vein No. 2" and the fourteen-foot vein commonly known as "Grassy Island vein." The agreement, which provided for payment of royalties on coal mined, contained a covenant by defendant to mine from the veins known as the "Grassy Island vein" and "No. 2 vein," or to pay therefor at the prescribed rate, not less than 20,000 tons per annum, until such veins shall be exhausted, or until such time as, in the opinion of defendant, it shall have paid for such minable coal as is contained in the veins. Subsequent provisions of the lease declared that, if veins underlying the Grassy Island vein should prove of such quality and thickness that it could be safely and economically mined, defendant should mine such veins or pay at the rate aforesaid, not less than 20,000 tons of coal per annum. Other veins were discovered above the Grassy Island vein, and plaintiffs contended that the lessee should mine them at the rate of 20,000 tons per annum or pay royalties thereon. Such veins were not specified in the lease contract; defendants contending that such veins were not discovered until after its execution. Held, that the provisions as to minimum royalties did not apply to such veins, whether they were discovered before or after execution of the lease, for, if known before, they were omitted from its provisions, and, if unknown, the lease showed no intention that the minimum royalty provisions should apply to mining of such veins.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 209.]

In Error to the District Court of the United States for the Middle District of Pennsylvania; Chas. B. Witmer, Judge.

Action by William S. Birdsall and others against the Delaware & Hudson Company. There was a judgment for plaintiff, and both plaintiffs and defendants bring error. Writs dismissed, judgment affirmed, and case remanded.

See, also, 216 Fed. 717.

The following is the charge of the court below:

The plaintiffs, William S. Birdsall and others, have brought this suit against the defendant, the Delaware & Hudson Company, to recover certain rentals or royalties alleged to be due and owing from the defendant, growing out of an agreement or lease for the rental and demise for a term of 99 years of the minable and merchantable coal underlying a lot or piece of land situate in the borough of Olyphant, this county, containing about 20 acres. It appears that the plaintiff and others for whom this suit was brought, being the owners of the mineral coal underlying the land in question, made, executed, and delivered on the 24th day of October, 1890, a contract or indenture with the President, Managers and Company of the Delaware & Hudson Canal Company, now the Delaware & Hudson Company, whereby the latter agreed to mine and prepare for the market all the mineral coal of merchantable quality that

could be safely and economically mined and taken from the premises in question, agreeing to pay as rental for such coal 30 cents per ton for each ton of 2,240 pounds of clean and merchantable coal mined and taken from the land larger than pea coal, 15 cents per ton for like coal of the size known as pea coal, and 7½ cents per ton for coal of the size known as buckwheat; nothing to be allowed for waste or coal smaller than buckwheat.

It furthermore appears that, at the time or date of this agreement, the defendant company was the owner of the land adjoining or surrounding the lot or land in question, upon which it was engaged in the mining and preparation of coal for the market, and that the property forming the subject of this agreement was then only partially opened; coal having been taken therefrom out of certain seams or veins known as "vein No. 2" and the fourteen-foot vein, commonly known as the "Grassy Island vein," and that it was the intent and purpose of the parties to the agreement that the coal should be mined and taken from this property by the defendant company when it could be conveniently reached in the operations and developments carried on on its own adjoining property, as appears from a clause in the lease, which says: "That the coal to be mined and removed as soon as and when it can be reached and economically and conveniently worked by the lessee in connection with the coal being mined from adjoining lands in the same seam or veins, and of this the superintendent of the lessee company is to be the sole judge and his decision is to be final and conclusive."

While the agreement provides that the coal underlying the land in question should all be mined so far as it could be economically and conveniently done in connection with their mining operations on their own land, for which payment was to be made as already stated, the agreement furthermore specifically sets forth and provides for the payment of certain minimum royalties to be computed and paid on coal contained in and mined from certain specified portions of the property in question. And it is for the recovery of such minimum royalties as provided for in the contract that the suit in question has been brought, and therefore we have to do only with that particular portion of the coal contained in the property as specified and the clauses in the lease providing for the payment of such minimum royalties; and for this purpose I will first call your attention to the provisions of the lease, which, in my opinion, govern in this case.

Quoting from the lease: "The said lessees further covenant and agree to mine from the lands hereby leased, from the veins known as the 'Grassy Island vein' and 'No. 2 vein,' or pay for at the rate aforesaid, not less than 20,000 tons of prepared coal per annum, until the coal that can be safely and economically mined from the Grassy Island and No. 2 veins aforesaid has been exhausted, or until such time as in the opinion of said lessees they shall have paid for as much merchantable and minable coal as is contained in said Grassy Island and No. 2 veins in the premises hereby leased." "The payments on the minimum annual quantity of 20,000 tons shall begin on the 1st day of October, A. D. 1890; that is, the first quarter shall begin on that date, and the first quarterly payment shall be made on or about the 15th day of January, A. D. 1891."

And in the next or following paragraph it is further provided as follows: "And the said lessees further covenant and agree to and with the said lessors that, if the veins underlying the Grassy Island vein shall prove to be of such quality and thickness that they can be safely and economically mined, they will mine from such vein or veins, or pay for at the rate aforesaid, not less than 20,000 tons of prepared coal per annum, after they have commenced to mine the same; it being specifically understood and agreed that the lessees are to make no payments for the coal in the veins underlying the Grassy Island vein until they shall have actually commenced to mine the same."

Following further on in this lease is contained as follows: "And it is further agreed by and between the parties hereto that if at any time the said lessees shall have paid as rent, in addition to all coal mined by them, for as much coal which they have not mined as, in the opinion of the engineer of the said lessees, shall remain in the premises unmined and subject to be

mined under the provisions of this agreement, the said lessees may cease to make further payments until they shall have mined out the quantity for which they have advanced payment, and thereafter the said lessees shall be liable to pay rent only for the quantity of coal remaining, capable of being mined, and only as the same is mined from time to time, using due and reasonable diligence to mine and remove the same."

It appears that since the date of the agreement and from the 15th day of January, 1891, down to 1902, the defendant paid in quarterly installments, as provided by the lease, minimum annual rental for and on account of minable coal taken from and contained in the veins known as Grassy Island vein and No. 2 vein, the aggregate sum of $69,000, and that after paying these rentals the company suspended payment; it being the opinion of those in charge of its operations, as contended for by the defendant, that all the minable coal contained in said Grassy Island and No. 2 veins upon the premises of the lessors that could be safely and economically mined had been paid for. And this brings us to the first proposition which I shall submit to you for your consideration.

While it is not denied that under the terms of the lease the defendant had the right to suspend the payment of such minimum royalties when, in the opinion of the superintendent, engineer, or those in charge of the company, the payments advanced were sufficient to cover all of the coal contained in these veins, however, it is alleged on the part of the plaintiff that the defendant fraudulently pretended that it had paid for all of the coal minable in said veins or seams under said lease, and that, in fact, such coal had not been paid for, even to this time.

I will submit to you, first, the determination of the matter as to whether it was really and honestly the opinion of those in charge of the defendant company's premises, as you may determine from all of the evidence in the case, that the coal in these two veins had been covered or paid for by the advancement of the minimum royalties made up to the time when payment was suspended, or was it a mere pretense on its part, as contended for by the plaintiffs, to escape further advancements and payments. You will remember that the contract puts it within the defendant's power or opinion to suspend payments. It goes without saying, of course, that such opinion must be an honest opinion before the suspension of the advancements or the further payment of the minimum royalties provided could be excused. Now, gentlemen, if all the evidence in the case, or what has been made to appear here, convinces you that it was at the time the honest opinion in good faith of those in charge of the defendant's operations that the coal in these two veins had been covered and paid for in the royalties advanced, there can be no recovery here of minimum royalties by reason of or on account of the same, although it may now appear that the parties, having formed such an opinion at 'the time, were really in error. Such recovery, if plaintiffs are entitled to any more money as royalties for coal from these veins, would have to be enforced under the general provisions of this lease and in some other way.

If, upon the other hand, you are satisfied that the suspension of the payment of royalties was fraudulent, and not in good faith, not honestly believing that the coal in these two veins had been fully paid for, you will then proceed to determine whether there was more coal in these two veins, the Grassy Island and No. 2 veins, that could be conveniently and economically mined than has been paid for by the advancement of the minimum royalties of $69,000.

On the part of the plaintiffs you have the statements of the defendant company showing the amount of coal taken from these veins and the value in royalties as provided by this agreement.

Ira E. Hartwell, called on the part of the defendant, testified that, taking into account the coal recovered from these two veins, together with such as is remaining and minable from observations and estimates made by him, he has given it to you as his conclusion and opinion that the royalty value of all the coal in the two veins minable at the time of the lease amounted to $67,548.88. He further says that, in his opinion as a mining engineer, he be-

lieves that $69,000 advanced in minimum royalties more than paid for all the coal in these two veins at the time of the agreement.

A. G. Bennett was also called on behalf of the defendant company, and testified that, in his opinion as a mining engineer, and from observations made on the premises, taking into account the coal returned by the company, as well as that remaining in place, the royalty value of all the coal that was in these veins at the time of the lease amounted to $64,802.21.

On the part of the plaintiff, Mr. Rittenhouse was called, who testified that he made numerous observations, and that by calculating the coal in place in 1891, and making due allowances for the coal covered by the royalties of $69,000 paid, there still remains due in royalties, as provided by the contract, for coal minable and unaccounted for the sum of $10,565.

John I. Riegel, who was also called by the plaintiff, has also testified that, from observations and calculations made by him, after deducting the amount of minimum royalties paid, there was due and remaining as such royalties in 1902 for minable coal in these two veins the sum of $12,410.

Now, gentlemen, it will be for you to determine which of these parties you will believe, and, by putting it in this way, I would not have you to infer that I impute willful or intentional misstatement of the facts as these expert witnesses have presented them to you. They all may be, and no doubt are, sincerely convinced of the honesty and force of the facts as they have presented them to you. It is a question for you to determine which of them can be most relied upon. How have they impressed you from the manner or the means employed to arrive at the conclusion reached by them? These are matters to be weighed and considered by you in arriving at a conclusion in solving this difference of opinion laid before you. If you conclude to accept the statement of the defendant's witnesses, or taking into account all that has been made to appear in the case, that the $69,000 advance royalties cover all the minable coal in these two veins, you need not carry your investigation any further, and find for the defendant. If, however, you find in favor of the plaintiffs, and believe that all of the coal minable from these two veins has not been paid for, you will determine the amount of such royalty not covered when the payment was suspended in 1902, allowing interest on the different quarterly payments of $1,500 whenever they were due from that day down to the present time; all, of course, resting upon the assumption that you find the defendant has not exercised his opinion in suspending payments in good faith, as I have already instructed you.

Now, coming to the next and last proposition requiring attention, pertaining to the mining of the coal upon these premises under or beneath the Grassy Island vein, as provided for in the clause of the agreement which I have already recited. While there is some evidence here in these maps offered suggesting that mining was begun in these veins and upon the premises on or about the bringing of this suit, nevertheless there is no evidence here to sustain a verdict that there were any payments due under the agreement for minimum royalties on account of such mining under the terms of the contract at the time of suit, and therefore I will instruct you not to make allowances for installments of minimum royalties on account of mining in veins under the Grassy Island vein.

S. B., C. B. & J. H. Price, of Scranton, Pa., for plaintiffs.
Welles & Torrey, of Scranton, Pa., for defendant.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case William S. Birdsall and others, citizens of Pennsylvania and Connecticut, and lessors, sued the Delaware & Hudson Company, a corporate citizen of New York, and lessee, to recover coal royalties alleged to have accrued on an anthracite coal mining lease. On trial, the jury found for the plain-

tiffs, and on entry of judgment both plaintiffs and defendant sued out writs of error. We dispose of both writs in the present opinion.

The pertinent provisions of the lease and the general nature of the controversy are set forth in the charge of the court, noted above. From such charge it will be seen the lease covenanted for payment of minimum royalties on three different coal seams, viz., vein No. 2, the Grassy Island vein, and the veins under the latter. On vein No. 2 and Grassy Island the lessee was to pay a stipulated royalty on a minimum of 20,000 tons a year until the coal was exhausted, or until, in defendant's opinion, it had paid for all merchantable coal in such veins. There was also a covenant that, if the coal in the veins underlying Grassy Island proved workable, a minimum royalty of 20,000 tons should be paid after the mining of such underlying veins was begun, and after payments of the minimum royalty on No. 2 and Grassy Island veins had ceased. The royalties payable on all these three veins were recovered in the verdict, and the correctness of the judgment entered thereon is not here questioned by either party.

The question raised by the plaintiff's writ concerns its alleged right to recover an additional minimum royalty of 20,000 tons per year upon three other veins of coal, viz., the Four-Foot, the Diamond, and the Rock vein, all of which lie below the Four-Foot and above the Grassy Island veins. These veins are not specifically mentioned in the lease. It is contended by plaintiff that they were not known when the lease was made, while defendant claims they were known. Be that fact as it may, the question before us is whether the lease contains any language which binds the lessee to pay this additional minimum royalty of 20,000 tons per year upon the Four-Foot, the Diamond, and the Rock veins.

Turning to the lease, we find it is for all the coal underlying the tract, so that we may assume, as indeed is conceded, that the lease covers all veins, whether then known or unknown, and therefore these three veins in question. But, when it comes to provisions for minimum royalties, we find that only certain veins are mentioned and expressly subjected to minimum requirements, viz., vein No. 2 and the Grassy Island absolutely, and the veins underlying Grassy Island only conditionally, and not concurrently with the payment of the minimum royalty on No. 2 and Grassy Island. Apart from these three veins, viz., No. 2, Grassy Island, and the veins underlying the latter, we find in the lease no language which expressly evidences a purpose to place the obligation of the minimum royalty on any other veins; nor do we find any implication which, from the language used, constrains us to impute any such purpose on the part of the contracting parties. If, as contended by plaintiff, the Four-Foot, the Diamond, and Rock vein were not known, it is evident that the parties had not in view an annual minimum royalty of 20,000 tons on unknown veins, which are only subject to the lease by virtue of the general provisions which covered all coal under the tract. On the other hand, if, as contended by defendants, these veins were known when the lease was made, the express mention and explicit covenant of a minimum royalty on No. 2, Grassy Island, and the veins below the latter, was a virtual exclu-

sion of all the other veins from minimum royalty requirements. The lease itself, its provisions and general intent, would seem reasonably clear, and it is only by giving a very particular construction to some general terms that the construction contended for by the plaintiff would seem possible.

But such construction does not appeal to us, for it would give, by implication from such general words and terms, the precise effect given to specific expressions by the specific words and terms elsewhere in the lease. To do this is for a court to create a broad, imaginary contract, when the parties have made a restricted, specific one. When these parties wished to impose a minimum annual royalty, they knew how to select the veins and to apply their covenants to them. Having done so, and themselves expressly defined and specifically stated to what veins the minimum should apply, a court has no grounds for saying they meant to contract for some other veins which they did not mention, and did not evidence any specific intent to subject to a minimum royalty. And such a construction would be at variance with the general spirit of the lease. For by it, as we have seen, even all of the three designated veins were not treated alike. Vein No. 2 and Grassy Island are included in one and subject to a joint minimum. The veins underlying the latter are subjected to a minimum only on certain conditions, and even that minimum requirement does not begin until No. 2 and Grassy Island have ceased paying their minimum. Indeed, the uncertainty to which plaintiff's construction would lead is shown by the question, Which of these different sorts of minimum shall we apply to these other veins, Four-Foot, Diamond, and Rock vein?

We are of opinion the court below committed no error in confining the contract for minimum royalties in this lease to what the parties expressly stipulated. To have gone further would have been error.

Turning to the defendant's writ, we may say that on the argument it developed that such writ was sued out in order to compel the plaintiffs to join with them on the record all other parties in interest, so that defendant might be released, on payment of royalties embraced in the verdict, from further liability therefor.

Counsel for plaintiff having stated that they represented each and every one of the present owners of the royalties under the lease, and that they would place of record proper releases from them before the judgment was paid, and this court being satisfied that defendant can be properly protected by the court below in that regard, we are satisfied that the defendant can, by a proper procedure in the court below, be given all the protection it seeks by this writ or a reversal upon it.

We will therefore dismiss both writs of error, affirm the judgment below, and remand the case for further proceedings.